IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JASMINE YOUNG, | : | CIVIL ACTION |
| | : | NO. 12-5729 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA POLICE | : | |
| DEPARTMENT, | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          March 31, 2015

Plaintiff Jasmine Young brings this action against

Defendant, the City of Philadelphia Police Department, alleging

that Defendant discriminated against her based on gender,

subjected her to a hostile work environment/sexual harassment,

and retaliated against her, in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII") and the Pennsylvania

Human Relations Act ("PHRA"). Defendant has moved for summary

judgment and, for the reasons that follow, the Court will grant

the motion.

I.    **BACKGROUND**[1]

Plaintiff, an African American woman, worked for the

Philadelphia Police Academy from February 22, 2010, to September

---
[1]      In accordance with the appropriate standard of review
for motions for summary judgment, the Court views the facts in
the light most favorable to the nonmoving party--the Plaintiff.

30, 2010. Am. Compl. ¶¶ 29, 51. She was first appointed to the Philadelphia Police Academy as a recruit officer ("R/O"). Id. ¶ 29. On August 16, 2010, she was promoted to police officer. Id. ¶ 30.

Shortly after Plaintiff joined the Academy, fellow recruit officer Hamin Chamberlain began texting Plaintiff on her personal cell phone. Def.'s Br. 4, ECF No. 32. He had obtained her phone number from the recruit class list, and had previously only spoken with her in group conversations with other recruit officers present. Pl.'s Br. 4, ECF No. 33.

Over the next few weeks, Plaintiff and R/O Chamberlain exchanged text messages about various topics. Def.'s Br. 4. He also repeatedly asked her out, although she never went out on a date with him. Pl.'s Br. 5. Plaintiff eventually sent R/O Chamberlain a text message asking if he had romantic feelings for her, and he admitted that he did. Def.'s Br. 5. She responded that she was not romantically interested in him, but she "would like to remain friends ☺." Id. Although R/O Chamberlain agreed ("Fo sho!"), the two stopped exchanging text messages shortly thereafter. Id.

Plaintiff alleges that sometime in March 2010, R/O Chamberlain began harassing her. Am. Compl. ¶ 33. After she rejected his advances, he allegedly began following her, calling

her via telephone, and swearing at her. Id. ¶ 38. In one incident on April 8, 2010, after being laughed at by classmates and threatening to "fuck the whole back row up," R/O Chamberlain called Plaintiff a "bitch" as they were leaving the classroom. Def.'s Br. 5. She retorted that he was a "dumbass" and "stupid," and the two exchanged further words before bystanders broke up the argument. Id. at 5-6.

According to Plaintiff, this was the last time she and R/O Chamberlain ever spoke to one another directly. See id. Ex. 2, Young Dep. 33:16-17. R/O Chamberlain continued to watch and follow Plaintiff without comment, however, and he posted remarks online about how Plaintiff ruined his life and would have to pay. Pl.'s Br. 6.

On the day of the classroom incident, Plaintiff submitted two memos to a supervisor, Sergeant Tim Fanning--one describing the incident, and another complaining of R/O Chamberlain's consistently harassing behavior. Id. She mentioned that after they stopped texting, R/O Chamberlain began making sarcastic and derogatory comments when she was around, including calling her a "bitch" numerous times and yelling "fuck you." Id. at 7. Sergeant Fanning encouraged Plaintiff to file an official complaint if she felt she was being harassed. Def.'s Br. 6.

3

Plaintiff filed a complaint regarding R/O Chamberlain's consistently harassing behavior with the Police Department's Equal Employment Opportunity (EEO) Unit on April 18, 2010. Id. The Police Department's Internal Affairs Bureau began investigating her claims, and in time R/O Chamberlain was transferred to another platoon. Id. at 7. Moreover, after complaining in May 2010 that R/O Chamberlain had been parking near her and staring at her when she returned to her car, he was directed to park in a separate area. Id. at 14.

Over the course of the roughly five-month-long investigation, Plaintiff alleges that she was retaliated against as a result of her EEO complaint. See id. Ex. 2, Young Dep. 248:18-249:7. In particular, she claims that she was subjected to inappropriate disciplinary actions and was disciplined more often after her complaint. Am. Compl. ¶ 47.

Violations of the Police Department's disciplinary policy may "result in a range of possible outcomes, including, but not limited to, writing a memorandum, receiving demerits, receiving a written warning, and/or receiving" a "duty day" (an added assignment to be completed during non-training hours). Pl.'s Br. 9-10. However, only demerits subject a recruit officer to rejection from the Academy. Id. This occurs when a recruit receives fifteen demerits. Def.'s Br. 8.

Plaintiff's disciplinary history began on April 2, 2010--a few weeks before she submitted her EEO complaint--when she received one "duty day" for failing to have her license at roll call. Id. at 9. Plaintiff concedes that she "earned" this discipline, and that it was not related to her later complaint or her gender. See id. Ex. 2, Young Dep. 65:21-66:6. Similarly unrelated were the two demerits and two duty days she received on April 20, 2010, for failing to have her pocketknife at roll call. See id. 71:4-14.

That same day, Plaintiff was ordered to write a memo to Sergeant David Lee for impermissibly stopping to talk with two other recruits in the hallway. Id. at 10. In this instance, Plaintiff claims that she was targeted because of her EEO complaint--based on the fact that Sergeant Lee singled her out and spoke directly to her, even though she had never had issues with him before her complaint. See id. Ex. 2, Young Dep. 74:15-75:15. Plaintiff concedes, however, that the other two recruits were ordered to write memos as well. See id. 75:9-11. Nevertheless, Plaintiff claims that her supervisors began to target not only her, but individuals with whom she interacted, so that other recruits would begin to isolate and exclude her. Pl.'s Br. 11.

Plaintiff asserts that some of the disciplinary actions taken against her in the weeks following these incidents were similarly based on her EEO complaint. On April 26, 2010, Plaintiff was disciplined for complaining in Corporal Robert Pawlowski's presence about the duty days she received for her missing-pocket-knife violation. Pl.'s Br. 11. According to Pawlowski, Plaintiff challenged her discipline in front of other recruits, and she continued to be defiant after he pulled her aside to reprimand her in the faculty room--"continually pursing her lips, huffing and puffing in disagreement, and tilting her head to the left almost laying on her shoulder." Id. Ex. 17, Pawlowski Mem. In accordance with the recruit officer regulations, Plaintiff received seven demerits and seven duty days for this insubordination, bringing her to an accumulated total of nine demerits as of April 26, 2010. Id. After being asked by Plaintiff, Corporal Pawlowski stated that the demerits had nothing to do with her EEO complaint. See Def.'s Br. Ex. 2, Young Dep. 88:16-89:14. When Plaintiff spoke with Captain William Maye about the incident on June 30, 2010, he stated that he did not understand why a recruit would receive so many demerits for her first insubordination offense. Pl.'s Br. 12. Although Plaintiff does not believe she received these seven demerits because of her gender, she does believe that it was

6

because of her EEO complaint--given "the way that [Corporal Pawlowski] reacted about the situation" and the "weird look" he gave her when she asked him if it was because of her complaint. Def.'s Br. Ex. 2, Young Dep. 88:16-89:14.

Plaintiff received her next demerit in May 2010 for parking next to R/O Chamberlain. Id. Ex. 20, Lee Mem. When Sergeant Fanning asked her why she did not park where she and the other recruits were supposed to park, Plaintiff explained that she had been running late. Id. Ex. 2, Young Dep. 142:3-5. Plaintiff believes she received this demerit because of her EEO complaint, although the only support that she offers for this claim is Sergeant Fanning's remark that she "wanted this"-- considering her request that R/O Chamberlain be moved to the other lot. Id. 154:13-155:4. Two weeks later, on June 11, 2010, Plaintiff was ticketed for speeding, which resulted in her receiving three additional demerits. Id. Ex. 22, Speeding Citation. Although Plaintiff does not believe she was issued demerits because of her EEO complaint, she does believe that, because of her complaint, she received three instead of a lower number in the regulation's up-to-five range. Id. Ex. 2, Young Dep. 163:20, 169:22-170:1.

On June 30, 2010, Captain Maye met with Plaintiff to discuss the thirteen demerits she had accumulated, informing her

7

that two more demerits would result in her dismissal, and counseling her to be careful and stay out of trouble. Id. 176:20-177:5, 177:13-16, 177:17-19. Afterward, she received a duty day for failing to shine her boots for roll call, but no demerit. Id. 178:14-20. Plaintiff claims that the EEO complaint motivated this reprimand, and that even though she was trying to be careful, they were just "looking for something." Id. 179:4.

Other incidents occurred that did not result in discipline, but Plaintiff asserts that they were motivated by her EEO complaint. In one instance, she was reprimanded for wearing her tie too long. See id. 49:15-50:8. Plaintiff claims that males were never reprimanded that way about their uniforms. See id. 56:7-12. Similarly, Sergeant Lopez told her that her Adidas gym bag looked like a purse--which recruits may not carry--and asked if she thought that the Academy was a "fashion show." Id. 140:7-14. Plaintiff claims that no one ever criticized her bag before her EEO complaint, nor did anyone rebuke male recruits with similar bags. Id.

Plaintiff further alleges that another supervising officer permitted and encouraged sexist comments to be made in his presence during the class he taught at the Police Academy. Pl.'s Br. 28. Male recruits would state that female officers should be paid less than males because females do not perform

8

the same duties, and that they should be relegated to the rape counseling unit. Id. Plaintiff also claims that a recruit named Acevedo made unwanted sexual comments and advances to Plaintiff, but nothing was done after she reported on the comments to Platoon Leader Case. Id. at 28-29. Similarly, a recruit named Zona was drinking at an Academy softball game with other officers and instructors present and, after calling Plaintiff over, he began singing loudly along with the radio: "black girls liked to get fucked all night long." Id. at 29 (internal quotation marks omitted). Although Zona was using such language in front of Corporal Pawlowski, Pawlowski merely commented that he was "not hearing any of this," and Zona received no discipline for the conduct. Id. (internal quotation marks omitted).

On September 8, 2010, the results of the investigation into Plaintiff's EEO complaint were presented in a memorandum to Police Commissioner Charles Ramsey. See Def.'s Br. Ex. 11, EEO Mem. The investigation included interviews of Plaintiff, R/O Chamberlain, Plaintiff's classmates, and ten of Plaintiff's instructors. See id. None of the witnesses could corroborate Plaintiff's claims of harassment by R/O Chamberlain, aside from some of the details of the classroom incident. See id. at 6, 8; Pl.'s Br. 9. Instead, the investigation found--as several of the witnesses testified--that Plaintiff had called R/O Chamberlain

9

names, cursed at him, and insulted his intelligence multiple times. See Def.'s Br. Ex. 11, EEO Mem. at 3-5. One recruit, however, stated that other students made comments about R/O Chamberlain in class, and no one was disciplined for the comments. Pl.'s Br. 9.

As a result of those findings, Captain Maye, Commanding Officer of the Recruit Training Unit, submitted a "Request for Rejection During Probation" to his superior officers on September 28, 2010. See Def.'s Br. Ex. 28, Maye Request. The request stated that the investigation revealed that Plaintiff had "referred to [R/O Chamberlain] as various inappropriate names including, 'stupid, ugly, dumb ass, stalker, asshole, etc.'" Id. at 1. It also stated that the investigation indicated that Plaintiff did not tell the truth during the course of the investigation. Id. Accordingly, the request found additional violations by Plaintiff, in her use of obscene or disrespectful language, her verbal abuse of another person, and her failure to cooperate with the investigation. Id. As a result, Plaintiff received additional demerits, bringing her to a total of twenty-two--well over the threshold for a recommendation of rejection during probation. Id. After the request was approved by multiple individuals in the chain of command, including Police Commissioner Ramsey, Plaintiff was dismissed effective September

10

30, 2010--a month after R/O Chamberlain had himself been rejected. Id. at 22.

Plaintiff does not claim that she was terminated because of her gender, but she does believe "that she suffered increased harassment compared with her male counterparts because of her gender." Pl.'s Br. 19. Ultimately, Plaintiff claims that she was terminated because she filed an EEO complaint, given the way that she was treated after she made the complaint.

## II.  PROCEDURAL HISTORY

After exhausting her claims via the proper administrative channels, see Am. Compl. ¶¶ 10-19, Plaintiff filed an amended complaint on April 29, 2013. ECF No. 9. On May 10, 2013, Defendants moved to dismiss Plaintiff's complaint. ECF No. 10. The Court granted the motion in part, dismissing Plaintiff's claims of race discrimination, her claims against Police Commissioner Ramsey, and her claim of intentional infliction of emotional distress. ECF No. 19. Three claims were allowed to proceed, however: (1) gender discrimination under Title VII and the PHRA; (2) hostile work environment/sexual harassment[2] under Title VII; and (3) retaliation under Title VII.

---

[2]      The terms "hostile work environment" and "harassment" may be used interchangeably to refer to the same claim available under Title VII. See, e.g., Haqq v. Pa. Dep't of Pub. Welfare, No. 09-0042, 2010 WL 1253452, at *9 n.7 (E.D. Pa. Mar. 23, 2010)

Based on these claims, as set forth in her amended complaint, Plaintiff seeks various forms of relief, including: compensatory, punitive, and liquidated damages; damages for emotional pain and suffering; reasonable attorneys' fees, costs, and interest; and other injunctive and equitable relief. Am. Compl. 15-16.

At the conclusion of discovery, Defendant filed a motion for summary judgment on May 9, 2014. ECF No. 32. Essentially, Defendant argues that Plaintiff cannot make out a prima facie case for any of her claims. With regard to her gender discrimination claim, Defendant asserts that Plaintiff did not satisfactorily perform her job duties, and--more fatally--she testified that none of her adverse employment actions, including her termination, were based on her gender. As for her hostile work environment/sexual harassment claim, Defendant argues that not only did R/O Chamberlain not create a hostile work environment for her, but as soon as Defendant had reason to know about Plaintiff's concerns, it launched a sweeping investigation. Finally, of her retaliation claim, Defendant contends that Plaintiff has no evidence that her protected activity caused any of her adverse employment actions and, in

---

(citing Brown v. J. Kaz, Inc., 581 F.3d 175, 182 n.4 (3d Cir. 2009)). Accordingly, as both parties use the terms to refer to the same claim, the Court will follow suit.

fact, her long history of performance issues began before she engaged in any protected activity.

Plaintiff filed a response on May 27, 2014. ECF No. 33. Plaintiff argues that she has made out a prima facie case for each of her claims. This matter is now ripe for disposition.

## III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation; a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the

13

nonmoving party." <u>Pignataro v. Port Auth.</u>, 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250 (internal quotation marks omitted).

**IV.   DISCUSSION**

        Defendant's motion for summary judgment asserts that Plaintiff has failed to raise a genuine issue of material fact on any of her claims. Each claim will be considered in turn.

    A.    <u>Gender Discrimination</u>

        For a plaintiff with indirect or circumstantial evidence--rather than direct evidence--of gender discrimination, that plaintiff must satisfy the three-step burden-shifting inquiry laid out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973), in order to prevail on a claim of gender discrimination under Title VII and its analogous provision under the PHRA.[3] First, the plaintiff must establish a prima facie case of gender discrimination. To make the required prima facie showing, she must prove that: (1) she is a member of a protected

---

[3]        "Claims under the PHRA are interpreted coextensively with Title VII claims." <u>Atkinson v. LaFayette Coll.</u>, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

class; (2) she was qualified for the position; (3) she suffered
an adverse employment action; and (4) the adverse action
occurred under circumstances that give rise to an inference of
discrimination. Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir.
2008) (citing McDonnell Douglas Corp., 411 U.S. at 802). For the
third element, an adverse employment action is an action by an
employer that is "serious and tangible enough to alter an
employee's compensation, terms, conditions, or privileges of
employment." Storey v. Burns Int'l Security Serv., 390 F.3d 760,
764 (3d Cir. 2004) (quoting Cardenas v. Massey, 269 F.3d 251,
263 (3d Cir. 2001)). As for the fourth element, a plaintiff can
raise an inference of discrimination by demonstrating that she
was treated less favorably than a similarly situated employee
outside of the protected class. Anderson v. Wachovia Mortg.
Corp., 621 F.3d 261, 273 (3d Cir. 2010).

         The Supreme Court has emphasized that the prima facie
showing "is not onerous" and poses a burden easily met--a burden
that serves to raise a rebuttable presumption of discrimination
by "eliminate[ing] the most common nondiscriminatory reasons"
for the employer's treatment of a plaintiff. Tex. Dep't of Cmty.
Affairs v. Burdine, 450 U.S. 248, 253-54 (1981); see also
Scheidemantle v. Slippery Rock Univ., State Sys. of Higher
Educ., 470 F.3d 535, 539 (3d Cir. 2006). If a plaintiff is able

to cross this "low bar for establishing a prima facie case of
employment discrimination," Scheidemantle, 470 F.3d at 539, the
burden of production then shifts to the employer to provide a
legitimate, nondiscriminatory reason for the adverse employment
action. Burdine, 450 U.S. at 254-55. Should the employer meet
this light burden, then the plaintiff must prove by a
preponderance of the evidence that the explanation offered by
the employer is a pretext for discrimination. Storey, 390 F.3d
at 764 n.11.

At this pretext step, "the court's 'factual inquiry
[then] proceeds to a new level of specificity[,]' Burdine, 450
U.S. at 255 . . . [and] [t]he presumption of discrimination
established by the prima facie showing 'simply drops out of the
picture.' St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,
511 . . . (1993)." Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d
358, 370 (3d Cir. 2008). With this "new level of specificity,"
the inquiry "turns from the few generalized factors that
establish a prima facie case to the specific proofs and
rebuttals of discriminatory motivation the parties have
introduced." Hicks, 509 U.S. at 516.

1.   Prima Facie Case

Conceding both that Plaintiff, as a female, is a
member of a protected class and that she suffered adverse

16

employment actions in her demerits and termination, Defendant
asserts that Plaintiff cannot make out the second and fourth
elements of a prima facie showing because (1) her disciplinary
record indicates that she was not qualified for the position,
and (2) none of the adverse employment actions occurred under
circumstances that give rise to an inference of discrimination.
See Def.'s Br. 31.

Although Defendant alleges that Plaintiff's steady
accumulation of demerits shows that she was not qualified for
the job, this argument begs the question. Plaintiff alleges that
Defendant's discriminatory animus led to many of these demerits.
In order for Defendant to then rely on these demerits as support
that Plaintiff was not qualified for the position, it must
assume the legitimacy of the demerits--which is the whole
question in this case.

As far as Plaintiff's qualifications are concerned,
the Police Academy's policy indicates that recruits with less
than fifteen demerits may still be qualified to graduate as
police officers. See id. at 8. Plaintiff argues that at least
eleven of her twenty-two demerits came as a result of her EEO
complaint. See id. Ex. 2, Young Dep. 88:9-90:22, 153:24-154:24,
163:17-166:20. Assuming at this stage of the proceeding that
Plaintiff is correct on that point, the remaining eleven

17

demerits she received--without more--would not have disqualified her from graduation.

Defendant similarly asserts that Plaintiff has failed to show that the circumstances of her adverse employment actions give rise to an inference of discrimination. To satisfy this fourth element of the required prima facie showing, a plaintiff may show that the employer has treated more favorably similarly situated persons not within the protected class. Anderson, 621 F.3d at 273; C.A.R.S. Prot. Plus, Inc., 527 F.3d at 366; see also, e.g., Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 223 (3d Cir. 2009) (noting that appropriate comparators are "employees [who] dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them" (internal quotation marks omitted)).

Plaintiff suggests that other male recruits can be considered comparators, given that they occupied the same position, were subject to the same rules and regulations, and were guilty of the same offenses, but were not disciplined to the extent that she was. Pl.'s Br. 32. Plaintiff offers two instances to support her disparate treatment argument: (1) her receipt of seven demerits for insubordination, and (2) her

18

receipt of demerits for using profanity and belittling R/O Chamberlain (following the conclusion of the investigation). As to the former, Plaintiff asserts that male recruits were not issued that many demerits for insubordination; as to the latter, Plaintiff claims that many other recruits engaged in similar conduct and received no discipline at all. Id. at 32.

Plaintiff cites a few specific examples where male recruits exhibiting similar conduct were not disciplined to the same extent that she was. In contrast to the seven demerits and seven duty days Plaintiff received for insubordination on April 26, 2010, she asserts that R/O Telesford "engage[d] Corporal Pawlowski in a verbal shouting match over his duty days," but only received two demerits and two duty days for his conduct. Id. at 27. In contrast to the demerits Plaintiff received for the language she directed to R/O Chamberlain, Plaintiff points to the foul language R/O Zona used in front of Corporal Pawlowski, for which he received no demerits. Id. at 29.

At first blush, Plaintiff's comparator evidence raises an inference of discrimination that is at least minimally plausible. As will be explained below, however, Plaintiff's factual allegations do not hold up under the "new level of specificity" called for when inquiring into the alleged pretext at step three of the McDonnell Douglas analysis. Hicks, 509 U.S.

19

at 516. Nevertheless, "[b]ecause the prima facie case is easily made out [and] is rarely the focus of the ultimate disagreement," Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992), the Court finds, for the sake of argument, that Plaintiff has asserted sufficient factual allegations to establish a prima facie claim of sex discrimination.

    2.  <u>Pretext</u>

    Plaintiff having made a prima facie showing of discrimination, the burden of production shifts to the Defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. However, as Plaintiff concedes that Defendant has "advanced a legitimate, non-discriminatory reason for terminating Plaintiff," Pl.'s Br. 33--namely, that Defendant's disciplinary actions were all warranted by her misconduct--the Court proceed directly to the pretext analysis.

    To prove pretext, and thereby defeat summary judgment, "[a] plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d

Cir. 1994). The Third Circuit has also said that factors such as "the timing of an employee's dismissal[] and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate." Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 669 (3d Cir. 1999) (quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638-39 (3d Cir. 1993)) (internal quotation marks omitted).

Plaintiff's allegations do not measure up to the "new level of specificity" called for by this third step of the McDonnell Douglas framework. See Burdine, 450 U.S. at 255. As will be explained below, no reasonable jury could find that Defendant's reasons for disciplining and terminating Plaintiff were pretextual.

Plaintiff first argues that "[t]he timing is suspect with respect to the timing of Defendant's proffered reason for termination"--in her attempt to both discredit Defendant's explanation and raise an inference of discriminatory intent. Pl.'s Br. 35. With this claim, Plaintiff asserts that Defendant waited until a mere handful of days before her prospective graduation to give her the final demerits (related to her cursing and insulting a fellow recruit in April 2010) that resulted in her termination. "Instead of addressing these alleged

21

violations in April 2010, Defendant instead [sic] waited over five (5) months, and only eight (8) days before Plaintiff's scheduled graduation, to take action." Pl.'s Br. 35. For Plaintiff, this apparent foot-dragging indicates that Defendant's proffered reasons are specious.

The uncontested facts, however, tell a different story. The investigation of Plaintiff's claims was extensive and time-consuming, considering that all of Plaintiff's classmates were interviewed, as well as ten of her instructors, for a total of forty-nine people. See Def.'s Br. Ex. 11, EEO Mem. Thus, the investigation took roughly five months--continuing through R/O Chamberlain's interviews on August 2 and 16, 2010, and ending with Captain Maye's memorandum to Police Commissioner Ramsey on September 8, 2010. Pl.'s Br. 8; Def.'s Br. 20. A few weeks later, Captain Maye submitted a "Request for Rejection During Probation" to his superior officers on September 28, 2010, which was approved. Def.'s Br. 22.

This chain of events does not support Plaintiff's assertion of undue delay on Defendant's part. Moreover, it does not appear that Defendant purposely waited five months to give Plaintiff demerits for her verbal altercations with R/O Chamberlain--in fact, R/O Chamberlain was only interviewed a few weeks before the investigation concluded. Defendant reasonably

waited until the investigation was completed to respond appropriately to the violations revealed by the investigation. To have acted sooner would have required Defendant to act upon incomplete information. These facts do not discredit Defendant's rationale.

The Third Circuit has stated that, "[t]o discredit the employer's articulated reason . . . the plaintiff may show . . . that the employer has treated more favorably similarly situated persons not within the protected class." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644-45 (3d Cir. 1998). Accordingly, in her other pretext argument, Plaintiff asserts that her comparator evidence[4] shows that Defendant's proffered reasons are pretextual. However, Plaintiff ignores the distinguishing circumstances that may well explain this alleged disparity between her and her peers--in particular, the circumstance of her prior disciplinary record.

Plaintiff's receipt of seven demerits on April 26, 2010, for insubordination did not occur in a vacuum. Rather, it happened after she had been disciplined for three different

---

[4]     The Third Circuit has stated that "it is important to remember that the prima facie case and pretext inquiries often overlap. As our jurisprudence recognizes, evidence supporting the prima facie case is often helpful in the pretext stage, and nothing about the McDonnell Douglas [] formula requires us to ration the evidence between one stage or the other." C.A.R.S. Prot. Plus, Inc., 527 F.3d at 370.

violations earlier that same month--for forgetting her license,
forgetting her pocket knife, and talking with recruits in the
hall. Plaintiff concedes she deserved the punishment for at
least the license and pocket knife incidents, and that none of
them occurred because of her gender. Moreover, the seven
demerits were given after she complained about the duty days she
received from the pocket knife violation. Plaintiff's burgeoning
disciplinary record is a crucial feature of the mosaic of her
particular circumstances, which must be considered in the
context of evidence of similarly situated individuals.

Plaintiff does not point to any comparators with
similar disciplinary records (i.e., male recruits that already
had several strikes against them) that received less severe
punishments for similar insubordination in front of an officer
and fellow recruits. In fact, other than Plaintiff's vague
allegations that male recruits were treated differently, she
offers only one specific incidence of a supervisor's reaction to
a male recruit's insubordination--that of R/O Telesford. In that
incident, R/O Telesford received two demerits and two duty days
for his insubordination. However, other than mentioning that R/O
Telesford had been complaining about duty days, Plaintiff does
not offer any additional information about his disciplinary
history that would show that he can be considered an appropriate

24

comparator. What's more, as will be discussed in more depth below, Plaintiff admitted that she did not believe that she received these seven demerits because of her gender. Def.'s Br. Ex. 2, Young Dep. 90:23-91:5. Overall, Plaintiff has not raised the inference that this particularly severe consequence for insubordination occurred because of her sex, rather than out of, perhaps, her supervisor's desire to underscore the gravity of her mounting record of infractions.

Similarly, Plaintiff's demerits for profanity and for verbal abuse of another recruit did not simply occur after a single altercation. Instead, the demerits came after she had already amassed thirteen other demerits, and after a five-month-long investigation and the testimony of a number of witnesses indicated that Plaintiff had so spoken to her fellow recruit on multiple occasions. See Def.'s Br. Ex. 28, Maye Request. Plaintiff points out that R/O Zona received no demerits for his profanity from the officer present, Corporal Pawlowski, who only stated that he was "not hearing any of this." Pl.'s Resp. 29. But this single, isolated incident does not present a comparable situation to that of Plaintiff. In her case, she only received demerits for her language after an extensive investigation revealed numerous and recurring instances of her use of profane language against R/O Chamberlain. Although other recruits may

not have been disciplined for their language, Plaintiff has not
pointed to any potential comparators with similar records that
were not disciplined for such conduct. Again, Plaintiff has
failed to raise the inference that discriminatory animus--rather
than her supervisors' desire for increased punishment/deterrence
in response to her mounting disciplinary record--motivated the
severity of the discipline she received.

Moreover, even if these examples did suffice as
comparators, Plaintiff's own admissions have undercut her claim
for sex discrimination--as she has repeatedly and consistently
affirmed that she did not believe that she was disciplined
disproportionately because of her gender. See Def.'s Br. Ex. 2,
Young Dep. 71:4-14, 71:4-14, 90:23-91:5, 158:12-15, 169:22-
170:1, 171:13-22, 174:20-23, 181:24-182:3, 257:4-7. When
questioned about each disciplinary action against her, Plaintiff
conceded again and again that she did not believe that her
punishments came as a result of her sex. Id. Although these
admissions, alone, are not entirely dispositive on the question
of her supervisor's motivations,[5] Plaintiff's claim of sexual

---

[5]     Although not authoritative, another court framed this
issue well in Centola v. Potter, 183 F. Supp. 2d 403, 411 (D.
Mass. 2002) (noting that, while the plaintiff's impression that
his fellow workers did not take actions against him based on his
sex "is relevant, it is not conclusive on the question of why
they acted the way that they did. . . . [given that the

discrimination flies in the face of her own numerous admissions
that she was not discriminated against based on her sex. When
these admissions are considered together with Plaintiff's
failure to identify sufficient comparators or other evidence of
discriminatory intent, however, it becomes clear that Plaintiff
has failed to raise an inference that the adverse employment
actions against her occurred because of her gender. Accordingly,
the Court finds that no reasonable jury could find that
Defendant's explanations are pretextual. See Anderson, 477 U.S.
at 248. Therefore, the Court will dismiss Plaintiff's sex
discrimination claim.

    B.   <u>Hostile Work Environment/Sexual Harassment</u>

        Plaintiff's sexual harassment/hostile work environment
claim against Defendant is based on her interactions with R/O
Chamberlain. <u>See</u> Am. Compl. ¶¶ 31-45, 68-74. That claim cannot
succeed however, because R/O Chamberlain did not create a
sexually hostile work environment for Plaintiff. Nor do her
claims with respect to the harassing conduct of other recruits
and instructors--allegations which are not raised in her amended
complaint--support the existence of a hostile work environment.

        To establish a prima facie case of hostile work
environment, a plaintiff must prove that: "(1) [she] suffered

---

plaintiff] cannot 'admit' to a motivation that only existed in
the minds of his harassers").

intentional discrimination because of [her] sex, (2) the
discrimination was pervasive [or severe],[6] (3) the discrimination
detrimentally affected [the plaintiff], (4) the discrimination
would detrimentally affect a reasonable person of the same sex
in that position, and (5) . . . respondeat superior liability"
existed. Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007);
see also Cardenas, 269 F.3d at 260. Given that the parties
appear to assume that the first element has been established,
the Court will confine its discussion to the remaining elements
of Plaintiff's claim.

   With respect to the level of severity required for
conduct to be actionable, a plaintiff's treatment must have been
"so objectively offensive as to alter the 'conditions' of [her]
employment. 'Conduct that is not severe or pervasive enough to
create an objectively hostile or abusive work environment . . .
is beyond Title VII's purview.'" Oncale v. Sundowner Offshore
Serv., Inc., 523 U.S. 75, 81 (1998) (quoting Harris v. Forklift
Sys., Inc., 510 U.S. 17, 21 (1993)). "[A] court must consider

---

[6]     The Third Circuit has "often stated that discriminatory
harassment must be 'pervasive and regular.' But the Supreme
Court's standard is 'severe or pervasive.' The difference is
meaningful, and the Supreme Court's word controls, so [the
Court] use[s] the severe or pervasive standard here." Jensen v.
Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006) (citations
omitted), overruled in part on other grounds by Burlington N. &
Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); see also Pa.
State Police v. Suders, 542 U.S. 129, 133 (2004).

the totality of the circumstances, including 'the frequency of
the discriminatory conduct, its severity, whether it is
physically threatening or a mere offensive utterance, and
whether it reasonably interferes with an employee's work
performance.'" Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d
436, 439 (E.D. Pa. 2001) (quoting Harris, 510 U.S. at 23).
"'[S]imple teasing,' . . . offhand comments, and isolated
incidents (unless extremely serious) will not amount to
discriminatory changes in the 'terms and conditions of
employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788
(1998) (citing Oncale, 510 U.S. at 82). Title VII is not a
"general civility code," and it does not prohibit the "ordinary
tribulations of the workplace, such as the sporadic use of
abusive language, gender-related jokes, and occasional teasing."
Id. at 788 (citations and internal quotation marks omitted).

    As for the vicarious liability element of the claim,
"[t]he basis of an employer's liability for hostile environment
sexual harassment depends on whether the harasser is the
victim's supervisor or merely a coworker." Huston v. Procter &
Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009)
(citation omitted). Plaintiff alleges that she suffered both
peer-to-peer and supervisor-employee harassment.

With peer-to-peer harassment, vicarious liability "exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Id.

With supervisor-employee harassment, an employer may be "subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee" when that employer has taken a "tangible employment action" against the plaintiff. See Burlington Indus. v. Ellerth, 524 U.S. 742, 765 (1998). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761. When no tangible employment action was taken, however, the employer may raise an affirmative defense to liability by showing (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 765; see also Faragher at 807.

30

1.   Peer-to-Peer Conduct

      a.   R/O Chamberlain's Conduct

Even accepting Plaintiff's factual allegations as true, R/O Chamberlain's conduct did not create a sexually hostile work environment for Plaintiff. The entirety of Plaintiff and R/O Chamberlain's interactions can essentially be summarized as follows: the two began exchanging text messages, which ended when Plaintiff asked if they could just "remain friends"; on April 8, 2010, after the classroom incident, Plaintiff and R/O Chamberlain exchanged heated words; after that day, the two never spoke again, although Plaintiff alleges that R/O Chamberlain would follow and stare at her; R/O Chamberlain was moved to a separate platoon after Plaintiff submitted her April 18, 2010 EEO complaint; on May 7, 2010, after Plaintiff complained that R/O Chamberlain had been parking near her car and staring at her, R/O Chamberlain was ordered to park in a separate lot; on August 20, 2010, R/O Chamberlain was terminated, see Def.'s Br. Ex 30, Report of Separation.

      Plaintiff has not specifically alleged or pointed to evidence of any other interaction with R/O Chamberlain during her time as a recruit officer. And the incidents above fall well short of the severity needed to show a hostile work environment.

31

Regarding the text messages, although Plaintiff did not voluntarily give him her number, she at no time told him to stop texting her; rather, her messages were consistently cordial. See id. Ex. 4 (text message logs). As for the verbal altercation after the classroom incident, Plaintiff admits to laughing at R/O Chamberlain, cursing at him, and calling him names. See id. Ex. 2, Young Dep. 32:23-33:3. This singular, "isolated incident," viewed in context, does not establish a hostile work environment for Plaintiff. See Faragher, 524 U.S. at 788. It was neither severe nor pervasive, and it was not "so objectively offensive as to alter the 'conditions' of [Plaintiff's] employment." Oncale, 523 U.S. at 81. Moreover, according to Plaintiff, they never spoke to one another again after that incident. See Def.'s Br. Ex. 2, Young Dep. 33:16-17. And as a result of the EEO complaint Plaintiff submitted several days later, R/O Chamberlain was transferred to another platoon-- further severing their contact. See id. Ex. 3, Pl.'s Resp. to Interrogatories at 3. R/O Chamberlain's conduct, as described by Plaintiff, did not rise to the level of creating a work environment that a reasonable fact finder would find hostile.

In addition to proving sufficiently offensive conduct, the plaintiff must also prove that the employer is vicariously liable. Again, with peer-to-peer harassment, vicarious liability

"exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston, 568 F.3d at 104 (citation omitted). Plaintiff has not argued that Defendant failed to provide a reasonable avenue for complaint; thus, the Court will confine this discussion to the question of Defendant's alleged negligence in addressing Plaintiff's complaint of harassment.

As discussed above, R/O Chamberlain's conduct did not create a hostile work environment for Plaintiff. Even if it had, however, Plaintiff cannot show that Defendant failed to exercise reasonable care in promptly correcting any potential harassment.

Once Plaintiff submitted a complaint to the Police Department's EEO unit, the Internal Affairs Bureau began its investigation--interviewing Plaintiff just a few days later. See Def.'s Br. Ex. 9, Young Interview. Shortly thereafter, R/O Chamberlain was moved to another platoon. See id. Ex. 3, Pl.'s Resp. to Interrogatories at 3. Later, when Plaintiff alleged that R/O Chamberlain was parking near her, R/O Chamberlain was ordered to park in a separate lot. See id. Ex. 2, Young Dep. 144:13-20, 146:1-7.

33

Defendant acted swiftly to address Plaintiff's allegations and to prevent potential harassment. Moreover, the investigation of Plaintiff's claims was extensive; all of Plaintiff's classmates were interviewed, as well as ten of her instructors, for a total of forty-nine people. Id. at 7. Plaintiff has not pointed to evidence that indicates that the City "failed to adequately supervise, control, discipline, and/or otherwise penalize the conduct, acts, and failures to act of Recruit Officer Chamberlin." Am. Compl. ¶ 72. Moreover, Plaintiff has not alleged what more Defendant could or should have done, or precisely how Defendant fell short and allowed further harassment to occur. Accordingly, even if R/O Chamberlain's conduct had risen to the level of creating a hostile work environment for Plaintiff, she has failed to establish Defendant's vicarious liability.

### b.   Other Recruits' Conduct

Despite the fact that the sexual harassment/hostile work environment claim in Plaintiff's amended complaint is based on her interactions with R/O Chamberlain, Plaintiff's response to Defendant's motion for summary judgment does not focus on R/O Chamberlain's harassing conduct. Rather, Plaintiff alleges that other recruits and instructors "created a workplace permeated with discriminatory intimidation, ridicule and insult that was

34

so severe or pervasive as to alter the conditions of Plaintiff's employment." Pl.'s Br. 36. Although these new claims were not raised in Plaintiff's pleadings, this is of little consequence, for these allegations do not change the result that Plaintiff cannot raise a viable hostile work environment claim.

With respect to other recruits' conduct, Plaintiff alleges that other "male recruit officers expressed sexist and derogatory remarks toward female recruit officer[s]." Id. at 37. Plaintiff also asserts that her fellow recruits spread unsubstantiated rumors about her supposed sexual activities. Id. Even assuming the truth of these claims, and assuming that they were severe enough that a reasonable recruit in her position would find such an environment severely detrimental, Plaintiff cannot make the required showing of vicarious liability.

Again, to make such a showing in the context of non-supervising coworker conduct, Plaintiff must either prove that "the employer failed to provide a reasonable avenue for complaint or, alternatively, [that] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston, 568 F.3d at 104. Plaintiff has not alleged that she lacked an avenue to complain of such misconduct--and the very facts of this case reveal some of the workings of the Academy's grievance process that were available

35

to her. Plaintiff also has not pointed to any evidence that she availed herself of the Academy's grievance procedures with respect to her peers' conduct--or shown that Defendant otherwise knew or should have known of the harassment--other than the EEO complaint about R/O Chamberlain's behavior.

The only other instance that Plaintiff alleges complaining about recruit conduct to a supervisor is when she reported R/O Acevedo's behavior--who had "rubbed his penis and explicitly licked his lips at Plaintiff," and told her that "she dressed like a whore and he was going to treat her as such"--to her platoon captain, who took no corrective action. Pl.'s Br. 37. While decidedly vulgar and repulsive, this singular, "isolated incident" was neither severe nor regular and pervasive enough "to alter the 'conditions' of [Plaintiff's] employment." Oncale, 523 U.S. at 81. Plaintiff has not alleged that such conduct ever occurred again, nor has she claimed that she reported any other similar incidents to her supervisors. Ultimately, Plaintiff fails make out a prima facie hostile work environment claim as to her other fellow recruits.

2.   Supervisor-Employee Conduct

Plaintiff has failed to make such a prima facie showing as to her instructors as well. Plaintiff claims that her "instructors participated in and perpetuated an environment that

36

was belittling toward women." Pl.'s Br. 37. The only specific allegations Plaintiff offers to support this claim are that "male instructors, including Officer West, ordered male recruits not to apologize for [] sexist views," and that "Officer West mocked and belittled women for their stature, and allowed his students to express views that women are incapable of commanding a presence in a room and should be relegated to counseling rape victims." Id. at 37-38. Plaintiff argues that a reasonable person would find such an environment detrimental, and alleges that "the incident in Officer West's classroom [provoked] shouting from other female recruits," and "[s]ome recruits even left the classroom out of disgust." Id. at 39.

Even assuming that Plaintiff is correct, she has again failed to prove vicarious liability--this time with regard to supervisor conduct. As mentioned earlier, an employer may be "subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee" when that employer has taken a "tangible employment action" against the employee. See Ellerth, 524 U.S. at 765. When no tangible employment action was taken, however, the employer may raise an affirmative defense to liability by showing (1) "that the employer exercised reasonable care to prevent and correct

37

promptly any sexually harassing behavior"; and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765; see also Faragher, 524 U.S. at 807.

Here, Plaintiff does not allege that Defendant took a tangible employment action against her in connection with these incidents. Indeed, the only tangible employment action alleged by Plaintiff--her discharge--had no relation with to the sexist environment allegedly permitted by some of Plaintiff's instructors. Nor has she shown that she lodged any complaints or that Defendant failed to take reasonable steps to address her complaints. Thus, Defendant may qualify for the affirmative defense to vicarious liability.

The Academy evidently implemented and disseminated a comprehensive anti-harassment policy with specific complaint procedures--as demonstrated by the EEO complaint she filed and the swift and comprehensive investigation that she initiated. Plaintiff also does not argue that Defendant should make any changes to or address any deficiencies in its grievance policy. Thus, Defendant acted reasonably and has satisfied the first element of the affirmative defense. See Ellerth, 524 U.S. at 765. Moreover, Plaintiff's complete failure to lodge any sort of

complaint about the conduct of her instructors satisfies the second prong of the defense, in that she "unreasonably failed to take advantage of [the] preventive or corrective opportunities provided by the employer." Id.

Ultimately, Plaintiff's failure to make out a prima facie hostile work environment showing as to R/O Chamberlain's conduct is fatal to her claim--as it is alleged in her amended complaint. However, even if the further claims as to her other fellow recruits and instructors are considered, Plaintiff still fails to establish her prima facie case. See Cardenas, 269 F.3d at 260. Therefore, the Court will dismiss Plaintiff's sexual harassment/hostile work environment claim.

C.   Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her protected activity and the adverse employment action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006). As both parties correctly assume, Plaintiff's EEO complaint qualifies as a protected activity. Moreover, in the form of Plaintiff's demerits and ultimate termination, Plaintiff has alleged the requisite materially adverse employment actions

that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 58 (2006) (citation and internal quotation marks omitted). The issue, then, is one of causation: Plaintiff must prove that she would not have suffered the adverse actions but for her protected activity. Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

Plaintiff claims that after she submitted her EEO complaint regarding R/O Chamberlain, she was retaliated against by a number of her superior officers, and was scrutinized more closely because of her complaint--resulting in additional disciplinary action. See Def.'s Br. Ex. 2, Young Dep. 248:18-21, 255:15-20. This ultimately led to her dismissal, which Plaintiff characterizes as the culmination of Defendant's retaliation against her.

Cases in which this third element of causation is at issue often focus on the temporal proximity between the protected action and the adverse employment act. See Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007). Where there is a lack of sufficient temporal proximity, however, circumstantial evidence of a "pattern of antagonism" may also give rise to an inference of causation. Id. (quoting Woodson v.

Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)) (internal
quotation marks omitted).

      Plaintiff argues that there is an "unusually
suggestive temporal proximity" between her EEO complaint and
when Defendant began issuing her demerits. Pl.'s Br. 40. In
particular, Plaintiff points to the fact that she submitted her
EEO complaint on April 18, 2010, and received the seven demerits
for insubordination only eight days later. Id. Closer inspection
of her disciplinary timeline, however, reveals that this
temporal proximity does not, of itself, support an inference of
causation in this case.

      Plaintiff received her first disciplinary action (one
duty day) for forgetting to bring her license to roll call on
April 2, 2010--weeks before her EEO complaint. Plaintiff
concedes that she "earned" this action. Def.'s Br. Ex. 2, Young
Dep. 65:21-66:6. Next, only two days after her EEO complaint,
Plaintiff received two demerits and two duty days for failing to
have her pocketknife at roll call-- again, she admits that she
deserved this action. Id. at 71:4-14.

      The temporal proximity of these nonretaliatory
punishments to the seven demerits Plaintiff received for
insubordination is just as suggestive--if not more so--than the
proximity to her EEO complaint. Continued infractions beget

continuing and even increasingly severe punishments. Under these circumstances, proximity alone does not raise an inference of causation--particularly where other temporally proximal events that cut against Plaintiff's but-for causation claim are at least as significant.

Plaintiff also asserts that she can demonstrate evidence of "ongoing antagonism," starting with those same seven demerits. From that day on, Plaintiff claims that she "felt as though she had a bulls-eye on her back, and Defendant targeted her for minor or petty infractions." Pl.'s Br. 40. She asserts that other recruits who had not submitted EEO complaints were not similarly targeted. Id. As discussed above with respect to her discrimination claim, however, Plaintiff has failed to offer comparators with similar disciplinary records (i.e., with a similarly substantial number of infractions that resulted in "deserved" discipline) that were punished less frequently or less severely. Again, the crucial issue here is but-for causation, and Plaintiff's attempts to show either suggestive temporal proximity or ongoing antagonism do not raise the inference that her EEO complaint--rather than her numerous technical violations--was the but-for cause of her demerits.

The Third Circuit has emphasized that "[t]hese [two approaches] are not the exclusive ways to show causation, as the

proffered evidence, looked at as a whole, may suffice to raise
the inference." <u>Kachmar v. SunGard Data Sys., Inc.</u>, 109 F.3d
173, 177 (3d Cir. 1997). However, viewing her allegations as a
whole does not avail her, as Plaintiff's explanations are mostly
vague, conclusory, and devoid of actual substantive evidence.
She claims she was retaliated against on April 20, 2010, because
she, of the three recruits, was the one Sergeant Lee spoke to in
that instance. Def.'s Br. Ex. 2, Young Dep. 74:20-75:11. She
claims that Corporal Pawlowski retaliated against her because he
"gave [her] like a weird look" when she asked whether he had
retaliated against her. <u>Id.</u> at 88:16-89:14. She claims that she
received a retaliatory demerit from Sergeant Fanning for parking
near her own alleged harasser, apparently because Sergeant
Fanning reminded her that she wanted to be separated from R/O
Chamberlain. <u>Id.</u> at 154:6-155:24. These instances exemplify the
insubstantial nature of all of her claims of retaliation. And
importantly, Plaintiff does not dispute the fact that--at least
technically--she deserved most if not all of the discipline that
she received.

Plaintiff has not raised the inference that her
complaint was the determining factor in her discipline. Rather,
a more likely inference is that Plaintiff's superiors believed

43

that she simply failed to maintain the level of care and discipline required by the Police Academy's policies.

Even accepting as true all of the facts alleged by Plaintiff, no rational trier of fact could find, based on the record here, that but for her EEO complaint, Plaintiff would not have been disciplined or ultimately discharged. Accordingly, since she has failed to raise a genuine issue of material fact, the Court will dismiss Plaintiff's retaliation claim.

## V.   CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment as to all of Plaintiff's claims. An appropriate order follows.